UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

STATE OF OHIO *ex rel.*
JEFF FAULKNER, *et al.*,

        Plaintiffs,

vs.

CITY OF MIDDLETOWN,

        Defendant.

Case No. 1:15-cv-122

Judge Timothy S. Black

## ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 14)

This civil action is before the Court on Defendant City of Middletown's motion

for summary judgment (Doc. 14) and the parties' responsive memoranda (Docs. 15, 16).

## I.      BACKGROUND

Plaintiff Jeff Faulkner owns over 100 rental properties in Middletown, Ohio, a

number of which are subsidized through the United States Department of Housing and

Urban Development's Section 8 program.[1]  Faulkner alleges that he has been harassed by

Defendant City of Middletown ("Middletown") for years.  Faulkner brings nine claims

against Middletown, which arise from: (1) a zoning change Middletown implemented

with respect to a piece of property Faulkner purchased; and (2) Middletown's arrest and

prosecution of Faulkner for landlord theft of rent.

---

[1] Faulkner brings this lawsuit in his individual capacity and in his capacity as trustee on behalf of
the Faulkner Family Trust dated 3-22-95.  In this latter capacity, Plaintiff brings a claim as a
Relator on behalf of the State of Ohio.  *See* Section IV.A.5, *infra*.  For ease of reference, the
Court will simply refer to Faulkner as Plaintiff, unless the capacity in which he brings a
particular claim is relevant to the analysis.

## II.  UNDISPUTED FACTS[2]

### A. Zoning Change

1. On October 5, 1971, Middletown adopted Resolution No. 4102.  (*See* Doc. 13 at 67–68; Doc. 13-3, Ex. 4).

2. Resolution No. 4102 confirmed the Middletown City Planning Commission's approval of a planned use modification to allow the development of Avalon Mobile Home Park and Avalon Gardens ("Avalon MHP") on approximately 59.55 acres located at the southeast corner of the intersection of Carmody Boulevard and Germantown Road in Middletown, near the Middletown Airport.  (*See* Doc. 13-3, Exs. 4, 8, 9; *see also* Doc. 14-2).

3. A planned use modification was necessary to develop Avalon MHP because "a mobile home park and accessory commercial stores" were not permitted to be developed in an area zoned I-1 (Industrial Park).  (*See* Doc. 13-3, Exs. 4, 8, 9).

4. The adoption of Resolution No. 4102 resulted in a zoning change from I-1 to I-1p for the land on which Avalon MHP was to be developed.  (*Id.*)

5. At some point in or after February 1987, the 59.55 acres on which Avalon MHP was developed was subdivided, resulting in the creation of two parcels at the southeast corner of the intersection of Carmody Boulevard and Germantown Road in Middletown.  (*See* Doc. 14-2).

6. The first parcel, 2400 Carmody, was approximately 1.92 acres in size and contained Avalon MHP's approved "accessory commercial stores."  (*Id.*)

7. The second parcel, 2410 Carmody, was approximately 57.63 acres in size and contained Avalon MHP's "mobile home park."  (*Id.*)

8. In 1995, Riverside Village Limited bought Avalon MHP, including 2400 Carmody and 2410 Carmody.  (*See* Doc. 13-3, Ex. 9).

9. After Riverside Village Limited purchased the park, conditions in Riverside MHP began to deteriorate.  (*Id.*, Exs. 8, 9).

10. By the mid to late 2000s, large numbers of mobile homes within Riverside MHP had fallen into disrepair, and criminal activity in Riverside MHP was on the rise.  (*Id.*)

---

[2] *See* Docs. 14-1, 15-1.

11.   Because conditions in Riverside MHP were so poor, Middletown began evaluating opportunities for redevelopment of the area that were consistent with the area's I-1 zoning classification.  (*See* Doc. 14-3 at ¶¶ 5–7).

12.   On October 30, 2012, Riverside MHP, which included both 2400 Carmody and 2410 Carmody, was sold.  (*See* Doc. 14-2).

13.   On November 2, 2012, ACG Cincinnati LLC ("ACG") purchased Riverside MHP, which included both 2400 Carmody and 2410 Carmody.  (*See* Doc. 13-3, Ex. 9; Doc. 14-2).

14.   After purchasing Riverside MHP, including both 2400 Carmody and 2410 Carmody, ACG immediately began demolishing dilapidated homes within Riverside MHP.  (*See* Doc. 13-3, Ex. 9).

15.   On May 20, 2013, ACG submitted an Application for Development Plan Process ("Application") to the Middletown City Planning Commission seeking a planned use modification at the Riverside MHP.  (*Id.*, Ex. 5).[3]

16.   The property address listed on ACG's Application was 2440 Carmody Boulevard, Middletown, Ohio.  (*Id.*)

17.   The office for Riverside MHP was located at 2440 Carmody Boulevard, within Riverside MHP's commercial strip center.  (*See* Doc. 13 at 72–74).

18.   In its Application, ACG indicated that it wanted to "re-zone the property from 306 spaces down to 132 spaces" to achieve less density.  (*See* Doc. 13-3, Ex. 5).

19.   The maps and plans submitted by ACG with its Application contemplated the western portion of Riverside MHP being removed from the I-1p overlay district and reverting back to an I-1 zoning classification.  (*Id.*, Ex. 7).

20.   On May 28, 2013, former City Planning Commission Secretary Martin Kohler sent a letter to owners of real property located near Riverside MHP, including Jeff Faulkner, Trustee of the Faulkner Family Trust dated 3-22-95 ("Faulkner Trustee"), notifying them that the City Planning Commission would hold a public hearing on June 12, 2013 regarding ACG's Application.  (*See* Doc. 13 at 75–76; Doc. 13-3, Ex. 6).

---

[3] Plaintiff admits this proposed fact as it pertains to 2410 Carmody.  (Doc. 15-1 at 2).  Defendant notes that 2410 Carmody was not listed anywhere on ACG's Application.  (*See* Docs. 14-1, 15-1).

21.     On June 12, 2013, the Middletown City Planning Commission held a public hearing regarding ACG's Application.  Faulkner attended the hearing.  (*See* Doc. 13 at 76; Doc. 13-3, Exs. 7, 8).

22.     At the beginning of the hearing, Kohler presented and explained ACG's Application to the City Planning Commission, including ACG's interest in having the western portion of Riverside MHP revert back to its original I-1 classification to facilitate development of businesses near the Middletown Airport.  (*See* Doc. 13 at 77–78; Doc. 13-3, Exs. 7, 8).[4]

23.     After Kohler's presentation, Chris Barry of ACG and Faulkner spoke in support of ACG's redevelopment of Riverside MHP.  (*See* Doc. 13 at 98–100; Doc. 13-3, Ex. 8).

24.     No other individuals spoke in favor of or against ACG's Application.  (*See* Doc. 13-3, Ex. 8).

25.     After hearing from the proponents of ACG's redevelopment of Riverside MHP, the City Planning Commission voted and recommended approval of ACG's Application.  (*Id.*)

26.     On June 18, 2013, City Council Clerk Betsy Parr sent a letter to owners of real property located near Riverside MHP, including Faulkner, notifying them that Middletown City Council would hold a public hearing on August 6, 2013 regarding redevelopment of Riverside MHP and the City Planning Commission's recommendations for the same.  (*See* Doc. 13-1 at 102; Doc. 14-4 at ¶ 5).

27.     On August 6, 2013, City Council held a public hearing regarding the City Planning Commission's recommendations for Riverside MHP.  Faulkner attended the hearing. (*See* Doc. 13-1 at 104; Doc. 13-3, Ex. 9).

28.     During the public hearing, Middletown Mayor Lawrence Mulligan called for opponents to ACG's proposed redevelopment of Riverside MHP and "none were heard."  (*See* Doc. 13-3, Ex. 9).

29.     On August 20, 2013, City Council adopted Resolution R2013-17.  (*See* Doc. 13-3, Exs. 10–11).

30.     Exhibit A to Resolution R2013-17 was consistent with the maps that were presented during the Planning Commission's June 12, 2013 public hearing.  (*See* Doc. 13-1 at 112).

---

[4] Plaintiff admits this proposed fact as it pertains to 2410 Carmody.  (Doc. 15-1 at 2).

4

31.   On August 20, 2013, Mayor Mulligan signed Resolution R2013-17.  (*See* Doc. 13-3, Ex. 10).

32.   On January 6, 2014, ACG applied for and was granted a lot split for 2410 Carmody. (*See* Doc. 14-3 at ¶¶ 8–10).

33.   At ACG's request, 2410 Carmody was divided into two parcels: the main 43.119 acre parcel, which retained the 2410 Carmody address; and "Parcel B," which was 14.506 acres in size and included the Germantown Road frontage.  (*Id.*; *see also* Doc. 13-1 at 103).

34.   On February 27, 2014, Faulkner Trustee entered into a Contract to Purchase Real Estate ("Contract") with ACG.  (*See* Doc. 13 at 58; Doc. 13-3, Ex. 1).

35.   The Contract provided that Faulkner Trustee would pay ACG $95,000 for 2400 Carmody and "Parcel B," which had been split from 2410 Carmody in the January 2014 lot split.  (*See* Doc. 13-3, Ex. 1).

36.   On March 26, 2014, Faulkner Trustee closed on the sale of 2400 Carmody and "Parcel B."  (*See* Doc. 13 at 62; Doc. 13-3, Ex. 2).

37.   After Faulkner Trustee closed on the sale of 2400 Carmody and "Parcel B," Faulkner Trustee and Chad Hagins entered into an agreement whereby Faulkner Trustee would sell 2400 Carmody to Hagins.  (*See* Doc. 13-1 at 125–26).

38.   On April 16, 2014, Faulkner Trustee submitted a Zone Change Application to Middletown requesting that 2400 Carmody and "Parcel B" be changed from their existing I-1 zoning classification to a C-2 zoning classification.  (*See* Doc. 13-3, Ex. 3).

39.   According to Faulkner Trustee's Zone Change Application, 2400 Carmody and "Parcel B" were "road frontage across from the Municipal Airport in which the city is promoting more people to this area.  (*Id.*)

40.   On May 14, 2014, the Middletown City Planning Commission held a public hearing regarding Faulkner Trustee's Zone Change Application.  Faulkner attended the hearing.  (*See* Doc. 13-1 at 121; Doc. 13-3, Ex. 13).

41.   At the beginning of the hearing, Kohler presented Faulkner Trustee's April 16, 2014 Zone Change Application to the Planning Commission.  (*See* Doc. 13-3, Ex. 13).

42. The minutes from the City Planning Commission's May 14, 2014 hearing reflect that the portions of Riverside MHP that Faulkner Trustee purchased—and which were removed from to I-1p overlay district in August 2013—were intended for industrial, not commercial, development. (*See* Doc. 13-1 at 123–25; Doc. 13-3, Ex. 13).

43. After Kohler's presented and Faulkner offered comments in support of his April 16, 2014 Zone Change Application, the Planning Commission adopted the staff recommendation that the Zone Change Application be denied. (*See* Doc. 13-3, Ex. 13).

44. On June 17, 2014, City Council held a public hearing regarding Faulkner Trustee's April 16, 2014 Zone Change Application for 2400 Carmody and "Parcel B." Faulkner attended the hearing. (*See* Doc. 14-4 at ¶ 6, Ex. 2).

45. After a presentation from Kohler regarding the City Planning Commission's recommendation, Mayor Mulligan opened the public hearing portion of the meeting, and Faulkner spoke in favor of his Zone Change Application. (*Id.*)

46. During his comments to City Council, Faulkner stated that he originally planned to only request that 2400 Carmody be rezoned but ultimately requested that both 2400 Carmody and "Parcel B" be rezoned after speaking with local business owners. (*Id.*)

47. Faulkner also told City Council that he would likely build a store and lock facility if 2400 Carmody and "Parcel B" retained their I-1 classification but that a change to the C-2 classification would open up additional opportunities for development. (*Id.*)

48. Faulkner Trustee's Zone Change Application was denied. Subsequently, on August 5, 2014, Faulkner submitted a Certificate of Zoning Compliance Form to Middletown indicating that he wanted to open a commercial retail store at 2400 Carmody. (*See* Doc. 13-3, Ex. 12).

49. That same day, Faulkner's Certificate of Zoning Compliance Form request was denied because commercial retail developments are not permitted in an I-1 zone. (*Id.*)

50. After the denial of Faulkner Trustee's August 5, 2014 Certificate of Zoning Compliance Form, Faulkner Trustee's agreement to sell 2400 Carmody to Hagins fell through. (*See* Doc. 4 at 7).

### B. Prosecution of Faulkner

51. Faulkner Trustee owns over 100 rental properties in Middletown. (*See* Doc. 13 at 20–21).

52. Of those rental properties, approximately 20% are occupied by low-income residents who receive subsidies through the Section 8 housing program. (*Id.* at 22–23).

53. On August 12, 2010, Faulkner Trustee entered into a Residential Lease Agreement ("Lease") with Kenneth McIntosh, who was, at the time, a participant in the Section 8 housing program. (*See* Doc. 13-3, Ex. 17).

54. The Lease was for a condominium located at 3155 Wilbraham Road in Middletown for the period from August 12, 2010 through July 31, 2011. (*See* Doc. 13-1 at 194; Doc. 13-3, Ex. 17).

55. Under the Lease, McIntosh's monthly rent to Faulkner Trustee was $650. (*See* Doc. 13-3, Ex. 17).

56. Because McIntosh had the water to 3155 Wilbraham Road turned off in February 2011 and vacated 3155 Wilbraham Road at some point prior to July 2011, the Middletown Public Housing Agency ("MPHA") recouped payments that it had made to Faulkner Trustee for 3155 Wilbraham Road. (*See* Doc. 13-1 at 195; Doc. 13-2 at 220–22).

57. On February 26, 2013, former Middletown Police Department Detective Ken Rogers and United States Department of Housing and Urban Development Office of Inspector General Special Agent Jason Magalski began an investigation into the recoupment of funds related to McIntosh's participation in the Section 8 housing program. (*See* Doc. 13-3, Ex. 21; Doc. 14-5 at ¶¶ 5–6).

58. During the investigation, Rogers was told that, on January 11, 2011, McIntosh signed a Lease/Purchase Agreement ("Lease/PA") for 2823 Wilbraham Road in Middletown. (*See* Doc. 14-5 at ¶ 7).[5]

59. McIntosh's Lease/PA was for the period from January 15, 2011 through February 28, 2012. (*Id.*)

---

[5] Plaintiff claims that he can neither admit nor deny undisputed facts 58, 59, 60, and 61. However, at this stage in the litigation, Plaintiff cannot rest upon such a statement. He must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

60.     Under the Lease/PA, McIntosh's monthly rent was $650.  (*Id.*)

61.     During the investigation, Rogers also was told that McIntosh had moved out of 3155 Wilbraham Road and into 2823 Wilbraham Road on or about February 2, 2011.  (*Id.* at ¶ 8).

62.     On January 3, 2014, Faulkner was charged with landlord theft of rent in Middletown Municipal Court Case Nos. 14CRA00041-A and 14CRA00042-A.

63.     On January 17, 2014, Judge Mark Wall heard testimony and arguments from counsel and determined that there was not probable cause to believe that Faulkner committed the alleged landlord thefts of rent.  (*See* Doc. 14-6).

### C. Procedural History

64.     On January 16, 2015, Relator-Plaintiffs filed their Complaint in the Butler County, Ohio Court of Common Pleas.  (*See* Doc. 4).

65.     On February 19, 2015, Middletown removed Relator-Plaintiffs' Complaint to this Court.  (*See* Doc. 1).

66.     On February 26, 2015, Middletown filed its Answer to Relator-Plaintiffs' Complaint. (*See* Doc. 5).

## III.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV. ANALYSIS

Plaintiff claims that his troubles with Middletown date back to 2008, when he contacted Middletown to complain that it was flooding part of his property, rendering it unusable. (Doc. 15-2 at ¶ 22).[6] Middletown denied responsibility for the flooding. (*Id.* at ¶ 23, Ex. 14). According to Plaintiff, almost immediately thereafter, Middletown performed an inspection on one of his properties and boarded it up. (*Id.* at ¶ 24). Plaintiff had to fight to get the home reopened. (*Id.*)

Plaintiff claims that Middletown subsequently began to "harass" him by giving him various citations, while declining to give his neighbors citations for similar issues. (Doc. 15-2 at ¶ 25). Accordingly to Plaintiff, in 2010, Middletown attempted to remove him from the Section 8 program in violation of federal law, along with other landlords. (*Id.* at ¶¶ 25, 27, 30). Further, Middletown sent out collection notices for past-due water bills, which threatened to terminate recipient families from the Section 8 program if the bills were not paid. (*Id.*, Exs. 1, 2). Plaintiff reported this latter activity to United States Department of Housing and Urban Development in July 2013. (*Id.* at ¶ 17).

---

[6] In his recitation of the facts, Plaintiff relies almost exclusively on his own affidavit. (*See* Doc. 15 at 2–7). Defendant argues that this affidavit should be stricken because it contains hearsay and relies on unauthenticated or improperly authenticated documents. (Doc. 16 at 1). However, Defendant fails to identify, specifically, the testimony that is problematic. Accordingly, the Court declines to strike the affidavit. However, the Court notes that Plaintiff may not use his affidavit to contradict prior sworn testimony in order to artificially manufacture a genuine issue of material fact. *See, e.g.*, *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006) (citation omitted).

Notwithstanding the parties' long history, all nine claims in the instant case arise from two subsequent events: (1) a zoning change Middletown implemented with respect to a piece of property Plaintiff purchased; and (2) Middletown's arrest and prosecution of Plaintiff for theft of rent.  The Court will address these claims in turn.

## A. Claims Related to the Zoning Change

### 1. Violation of Section 1983—Depravation of Due Process Guaranteed by the Fourteenth Amendment[7]

Plaintiff alleges that Middletown deprived him of his Fourteenth Amendment due process rights by failing to provide "the appropriate notices, hearings and procedures of the down-zoning of 2400 Carmody."  (Doc. 4 at 7–8).[8]

The Fourteenth Amendment prohibits any State from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1. Procedural due process "is traditionally viewed as the requirement that the government provide a 'fair procedure' when depriving someone of life, liberty, or property."  *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).  In order to establish a procedural due process claim, a plaintiff must show that: (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and

---

[7] Although Plaintiff invokes both the Fifth and Fourteenth Amendments with respect to this claim, the Fourteenth Amendment controls.  *See Dusenbery v. United States*, 534 U.S. 161, 167, (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without "due process of law." ).

[8] The term "down-zoning" refers to the fact that the zoning classification of 2400 Carmody was changed from I-1p to I-1.  (*See* Doc. 13 at 65–66).

(3) the state did not afford him adequate procedural rights prior to depriving him of the protected interest. *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009) (citation omitted).

To determine whether a plaintiff has a protected property interest, the court looks to substantive state zoning laws. *Wedgewood Ltd. P'ship I v. Twp. Of Liberty, Ohio*, 610 F.3d 340, 352 (6th Cir. 2010). "[A] party obtains a protected property right under the Fourteenth Amendment when it "can demonstrate a 'legitimate claim of entitlement' or a 'justifiable expectation' in the approval of his [building] plan.'" *Id.* (quoting *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992)). In order to establish such a protected property right, a plaintiff must prove that the state or local governmental actor lacked the discretion to deny his proposed land use, so long as plaintiff complied with all applicable zoning requirements. *See Silver*, 966 F.2d at 1036; *Richardson v. Twp. of Brady*, 218 F.3d 508, 517 (6th Cir. 2000) (stating that there can be "no legitimate claim of entitlement to a discretionary decision").

"Property *owners* may have a property interest in the existing zoning classification for their property.*" EJS Props., LLC*, 698 F.3d at 856 (citation omitted) (emphasis added). However, Plaintiff did not own 2400 Carmody on August 20, 2013—the date Resolution R2013-17 was adopted. In fact, Plaintiff did not purchase 2400 Carmody for another six months. Accordingly, Plaintiff cannot assert a "legitimate claim of entitlement" or "justifiable expectation" based on ownership of 2400 Carmody at the time Resolution R2013-17 was adopted.

11

Nor can Plaintiff claim that he had a "legitimate claim of entitlement" or "justifiable expectation" in his ability to develop 2400 Carmody under the I-1p classification when he entered into a contract to purchase 2400 Carmody in February 2014. At the beginning of the City Planning Commission's June 12, 2013 public hearing, Kohler presented a summary of ACG's Application through the use of PowerPoint slides. (Doc. 13-3, Ex. 7; *see also* Doc. 13 at 77–78). During that presentation, the members of the Planning Commission and the public in attendance (including Plaintiff) were informed that ACG's proposed redevelopment of Riverside MHP contemplated that the western portion of the park, which encompassed 2400 Carmody, would revert back to uses permitted in the I-1 zone. (Doc. 13-3, Ex. 7; *see also* Doc. 13 at 84–87). In fact, the minutes from the Planning Commission's June 12, 2013 meeting reflect that "[t]he mobile home park property contains a strip center that . . . would be removed from the overlay district and would need to contain uses permitted in the I-1 zone." (Doc. 13-3, Ex. 8; *see also* Doc. 13 at 92–93, 100).[9] The minutes also reflect that Plaintiff, after being sworn, stated that he was in support of ACG's proposal. (Doc. 13-3, Ex. 8; *see also* Doc. 13 at 98–99). Accordingly, following the Planning Commission's meeting, it was clear that 2400 Carmody would revert back to its original I-1 classification if ACG's Application were ultimately approved.

The minutes from the subsequent City Council meeting—which Plaintiff also attended—similarly reflect the understanding that approval of ACG's Application would

---

[9] In his deposition, Plaintiff confirmed that the "strip center" referred to in the minutes is the building on 2400 Carmody. (Doc. 13 at 97–98).

12

result in the "eliminat[ion of] the western portion of the park from the Planned Use Modification Overlay District." (Doc. 13-3, Ex. 9; *see also* Doc. 13-1 at 103–04). Indeed, those minutes indicate that Kohler discussed how ACG proposed to "eliminate the strip commercial center" and "reduce the number of mobile home lots and to create future light industrial development sites." (Doc. 13-3, Ex. 9). When Mayor Mulligan opened the public hearing portion of the meeting and asked for opponents to ACG's project, "none were heard." (*Id.*)

Finally, and perhaps most importantly, Resolution R2013-17 itself confirms that 2400 Carmody was included in the area reverting back to an I-1 classification as a part of ACG's redevelopment plan. (Doc. 13-3, Exs. 10, 11). In his deposition, Plaintiff admitted that the map attached to Resolution R2013-17—which is consistent with the materials presented to the Planning Commission—removed the I-1p overlay from 2400 Carmody. (Doc. 13-1 at 107–12).

Plaintiff argues that neither ACG's Application (which reference 2440 Carmody); nor the public hearing notices (which reference 2410 Carmody), nor the Resolution (which states that it "approv[es] an amendment to the planned use modification development plan for the mobile home park located at 2410 Carmody Boulevard"), put him on notice that 2400 Carmody would be rezoned. Plaintiff contends that 2400 Carmody was not rezoned when the Resolution was adopted but, instead, *after* he purchased the parcel and contacted the city about the operation of a strip mall. Plaintiff

claims that Middletown simply changed its map at that time, without hearing or notice. (*See* Doc. 15-2 at ¶ 35). [10]

In light of the record evidence, Plaintiff's argument fails. Notwithstanding the clerical errors in the omission of "2400 Carmody" from the Application, notices, and *text* of the Resolution, for the reasons set forth above, Plaintiff had knowledge, no later than June 12, 2013, that ACG's proposed redevelopment of Riverside MHP would result in the western portion of the park, including 2400 Carmody, reverting back to its original I-1 zoning classification. The Resolution specifically incorporates the map reflecting the removal of the I-1p overlay from 2400 Carmody. (Doc. 13-3, Ex. 10) ("The planned use modification overlay (1-1 p) is removed from a portion of the subject property as shown on Exhibit "A" attached hereto.") Because Plaintiff knew that 2400 Carmody was going to revert back to an I-1 classification, and ultimately did revert back to an I-1 classification upon the adoption of Resolution R2013-17, Plaintiff cannot claim that he had either a "legitimate claim of entitlement" or a "justifiable expectation" that 2400 Carmody could be developed under an I-1p classification at the time he purchased it. Accordingly, Middletown is entitled to summary judgment on Plaintiff's procedural due process claim.

---

[10] Plaintiff alleges that he looked at the City's online map at the time he purchased the property from ACG and "saw that 2400 Carmody still had an I-1p overlay allowing the commercial strip center." (Doc. 15 at 6). The document he cites in support of his contention appears to be a printout from the City of Middletown website, as of August 5, 2014, with handwritten notations. (Doc. 15-2, Ex. 19). Plaintiff offers no evidence that the website, as opposed to the Resolution, and exhibits incorporated therein, controls.

## 2. Violation of Section 1983—Depravation of Due Process Guaranteed by the Ohio Constitution

Plaintiff also alleges that Middletown deprived him of his due process rights guaranteed by Article I, Section 16 of the Ohio Constitution.  (Doc. 4 at 8).   Middletown argues that Plaintiff's claims with respect to the Ohio Constitution fail for the same reasons his claims fail with respect to the United States Constitution.  The Court agrees. *See Wedgewood Ltd. P'ship I v. Township of Liberty, Ohio*, 610 F.3d 340, 349 n. 5 (6th Cir. 2010) (citations omitted) ("Procedural due process and vagueness claims brought under the Ohio Constitution are governed by the same legal standards applicable to the federal constitution.").  Further, to the extent Plaintiff brings a Section 1983 claim based on this alleged depravation, his claim fails for another reason: such claims can only be brought for violations of the United States Constitution or federal law.  *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (to prevail on a Section 1983 claim, a plaintiff "must establish that a person acting under color of state law deprived [him] of a right secured by the Constitution or laws of the United States.")

## 3. Violation of Section 1983—Depravation of Equal Protection Guaranteed by the Fourteenth Amendment

Plaintiff alleges that Middletown deprived him of his Fourteenth Amendment right to equal protection because, "[b]y imposing the I-1 zoning on the 2400 Carmody property[,] the City of Middletown singled out the real property of Faulkner Trustee for discriminatory treatment, has treated Faulkner Trustee's property from similarly situated real property to the detriment of Faulkner Trustee, and has caused the real property of

15

Faulkner Trustee to be unduly restricted in relationship to surrounding property." (Doc. 4 at 8–9).

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The clause protects similarly situated individuals against disparate treatment through government action that "burdens a fundamental right, targets a suspect class, or has no rational basis." *Center for Bio–Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal quotation marks omitted).[11]

"Equal protection claims can be brought by a "class of one," where the plaintiff alleges that the state treated the plaintiff differently from others similarly situated and that there is no rational basis for such difference in treatment." *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005). "A 'class of one' plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by negativing every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Id.* at 711 (internal quotation marks and alteration omitted).

The "rational basis" test turns upon the rationality of state action, not upon whether it was wise or effective policy. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 316–17 (1976) (per curiam). "[I]f there is any reasonably conceivable state of facts that could provide a rational basis for" the state's conduct, then the state has not violated the

---

[11] Here, Plaintiff has not alleged that a fundamental right has been burdened or that he is a member of a suspect class.

constitution. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Put another way, "courts will not overturn government action 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational.'" *Warren*, 411 F.3d at 710–11 (quoting *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 84 (2000)).

As an initial matter, Plaintiff does not cite to any evidence which demonstrates that he was treated differently than a similarly situated party with respect to a zoning decision. Nonetheless, even if Plaintiff had presented such evidence, he cannot negate "every conceivable basis which might support" the reversion of 2400 Carmody back to its original zoning classification. *Warren*, 411, F.3d at 711. 2400 Carmody was originally part of a larger, single parcel in the I-1 zone. Even after the original planned use modification was approved in October 1971, the mobile home park bordered I-1 properties. (Doc. 13-3, Ex. 7). Indeed, Middletown's Master Plan called for Riverside MHP to revert back to I-1 uses. (*See* Doc. 13-3, Exs. 8, 9). Thus, when Resolution R2013-17 was adopted by City Council and 2400 Carmody reverted back to its original I-1 classification, it actually became more like the properties surrounding it. This not only undercuts Plaintiff's contention that Middletown has "unduly restricted" 2400 Carmody in relation to surrounding properties, but also provides a rational basis for Middletown's zoning decision with respect to 2400 Carmody.

Again, Plaintiff suggests that Middletown singled Plaintiff out by "imposing" the I-1 classification on 2400 Carmody *after* Plaintiff purchased it. However, as set forth in

17

Section IV.A.1, *supra*, the record evidence establishes that 2400 Carmody reverted back to its original I-1 zoning classification upon the adoption of Resolution R2013-17.  (Doc. 13-3, Exs. 10, 11).  This Resolution was adopted only after it was discussed at the Planning Commission's June 12, 2013 public hearing and City Council's August 6, 2013 public hearing.  (Doc. 13 at 76; Doc. 13-1 at 104).  All of these events took place *before* Plaintiff purchased 2400 Carmody.  (Doc. 13 at 62).  For this reason, Plaintiff cannot demonstrate that Middletown's adoption of Resolution R2013-17 "was motivated by animus or ill-will" against him.  Accordingly, Middletown is entitled to judgment as a matter of law with respect to this claim.

### 4. Violation of Section 1983— Depravation of Equal Protection Guaranteed by the Ohio Constitution

Plaintiff also alleges that Middletown deprived him of the equal protection rights guaranteed by Article I, Section 2 of the Ohio Constitution.  (Doc. 4 at 9).   Middletown argues that Plaintiff's claims with respect to the Ohio Constitution fail for the same reasons his claims fail with respect to the United States Constitution.  The Court agrees. *See Woods v. Miamisburg City Sch.*, 254 F. Supp. 2d 868, 877 (S.D. Ohio 2003) (citations omitted) ("The Ohio Supreme Court has repeatedly recognized that the equal protection provisions in the Ohio Constitution and the United States Constitution are equivalent.").  Further, to the extent Plaintiff brings a section 1983 claim based on this alleged depravation, his claim fails for another reason: such claims can only be brought for violations of the United States Constitution or federal law.  *See Radvansky*, 395 F.3d at 302.

18

**5. Writ of Mandamus**[12]

Plaintiff seeks a writ of mandamus to compel Middletown to compensate him for the taking of his property rights without due process of law or the payment of just compensation. (Doc. 4 at 9–10).[13] Specifically, Plaintiff alleges that the "selective down-zoning of 2400 Carmody, without notice, constitutes the regulatory taking of Faulkner Trustee's property rights." *Id*.

In order for a court to issue a writ of mandamus, a relator must establish: (1) the relator possesses a clear legal right to the requested relief, (2) the respondent possesses a clear duty to perform the requested relief and (3) there is no other adequate remedy in the ordinary course of the law. *State ex rel. Ney v. Niehaus*, 33 Ohio St.3d 118, 515 N.E.2d 914 (1987). The facts submitted in support of a complaint for mandamus and the proof produced must be plain, clear, and convincing. *State ex rel. Pressley v. Indus. Comm. of Ohio,* 11 Ohio St.2d 141, 228 N.E.2d 631 (1967).[14] The Sixth Circuit has confirmed that, in Ohio, the appropriate method for seeking compensation for an alleged regulatory taking of property is a petition for a writ of mandamus to compel the government to initiate appropriation proceedings. *See Coles v. Granville,* 448 F.3d 853, 861 (6th Cir. 2006); *McNamara v. City of Rittman,* 473 F.3d 633, 638 (6th Cir. 2007).

---

[12] Plaintiff brings this claim in the name of the State as required by Ohio Rev. Code § 2731.01.

[13] The Court addresses Plaintiff's due process claims in IV.A.1 and IV.A.2, *supra*.

[14] The clear and convincing standard is an elevated, relatively stringent evidentiary standard requiring a determination of "whether the evidence is fit to induce conviction in the minds of reasonable persons." *Millers Bottled Gas Inc. v. Borg-Warner Corp.*, 955 F.2d 1043, 1050 (6th Cir. 1992).

Here, Plaintiff cannot prove that he has a clear legal right to a writ of mandamus. The Fifth Amendment prevents the Federal Government and, through the Fourteenth Amendment, the States from "tak[ing]" "private property . . . for public use, without just compensation."  This guarantee applies to a variety of government takings, including regulatory takings.  *See McCarthy v. City of Cleveland,* 626 F.3d 280, 284 (6th Cir. 2010).  To be considered a *categorical* regulatory taking, a regulation must deny a property owner "all economically beneficial or productive use of the land."  *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992); *see also State ex rel. Shelly*, 115 Ohio St.3d 337, 2007-Ohio-522, 875 N.E.2d 59, ¶ 20.[15]  With respect to a categorical taking, once it is proven that a regulation has deprived the land of all economic value, compensation is automatically required under the Fifth Amendment.  *Anderson v. Charter Twp. of Ypsilanti*, 266 F.3d 487, 493 (6th Cir. 2001).

Here, the land still has some viable economic use, even after it reverted to the I-1 zoning classification.  This is best evidenced by the fact that Plaintiff advised the Middletown City Council during its June 17, 2014 public hearing on his zone change application that, if 2400 Carmody retained its I-1 classification, he would likely build a store and lock facility.  (Doc. 14-4 at ¶ 6, Ex. 2).  For these reasons, Middletown is entitled to summary judgment on Plaintiff's claim for a writ of mandamus to compel appropriation hearings.

---

[15] There is a second category of regulatory takings, referred to as partial or a non-categorical takings, which the Court addresses in Section IV.A.6, *infra*.

### 6.  Depravation of Investment-Backed Expectations[16]

Plaintiff alleges that Middletown caused him "to lose his ability to develop [2400 Carmody] for a reasonable and proper use," and, thereby, deprived him of "his investment-backed expectations." (Doc. 4 at 11).

A *partial* or *non-categorical* regulatory taking prevents the property owner from some—but not all—economic uses of the land.  Such an action may still require compensation depending on the level of governmental intrusion.  *See Anderson v. Charter Twp. of Ypsilanti*, 266 F.3d 487, 493 (6th Cir. 2001).  In this context, the Court considers three factors: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action.  *Id.* at 493–94.  Thus, while interference with a claimant's investment-backed expectations is a relevant consideration, it is not an independent claim.

Regardless, even if the Court found that Plaintiff had sufficiently pled a *partial* or *non-categorical* regulatory takings claim, it would still fail.  2400 Carmody and "Parcel B" are still capable of being developed consistent with uses permitted in the I-1 zone. (Doc. 13-3, Ex. 8).  Further, Plaintiff conceded that if 2400 Carmody retained its I-1 classification, he could build a store and lock facility.  (Doc. 14-4 at ¶ 6, Ex. 2).  For these reasons, the economic impact on Plaintiff does not evidence a weight heavily in favor of compensation.

---

[16] Plaintiff did not discuss this claim in his memorandum in opposition to Defendant's motion for summary judgment.  (Doc. 15).

During his deposition, Plaintiff testified that Middletown deprived him of the following investment-backed expectations: "I wanted to open up my commercial strip center and then I had the property sold as a commercial strip center." (Doc. 13-1 at 134). However, Plaintiff also admitted that he was aware of the planned uses for 2400 Carmody prior to purchasing it. (*Id.* at 124–25). Accordingly, and because Plaintiff was aware of what kinds of businesses could be operated on 2400 Carmody and "Parcel B" before he purchased them from ACG on March 26, 2014, Plaintiff cannot argue that Middletown deprived him of any *legitimate* investment-backed expectations.

Finally, 2400 Carmody reverted back to its original classification only after ACG's Application was submitted, notices were mailed to property owners, and public hearings were held. The Court cannot find that Middletown's exercise of its zoning authority in this manner was unreasonable. For all of these reasons, Middletown is also entitled to summary judgment with respect to this claim.

### 7. Declaratory Judgment

As an alternative to a writ of mandamus, and pursuant to Ohio Rev. Code § 2721.03, Plaintiff seeks a declaratory judgment that the current zoning of property is illegal, confiscatory, and unconstitutional. (Doc. 4 at 11).[17] Plaintiff alleges that the

---

[17] Ohio Rev. Code § 2721.03 provides, in pertinent part:

> Subject to division (B) of section 2721.02 of the Revised Code, . . . any person whose rights, status, or other legal relations are affected by a . . . municipal ordinance . . . may have determined any question of construction or validity arising under the . . . ordinance . . . and obtain a declaration of rights, status, or other legal relations under it.

zoning regulations imposed by Middletown: (1) deprived Plaintiff of the economically viable use of the subject property; (2) "bear no reasonable relationship to the public health, safety, morals, or general welfare"; and (3) "fail to advance substantially a legitimate government interest." (*Id.*)

For the reasons set forth *supra*, the Court finds no basis in the record for these claims.[18]  As set forth above, the Court does not find any illegality with respect to Middletown's "down-zoning" of 2400 Carmody.  Accordingly, the Court finds that Middletown is entitled to summary judgment on this claim.

### B. Claims Related to Plaintiff's Prosecution

### 1. Malicious Prosecution

Plaintiff alleges that Middletown maliciously prosecuted him for theft of rent. (Doc 4 at 12).  Specifically, Plaintiff claims that Middletown "lacked all probable cause in instituting and continuing the prosecution," which was terminated in Plaintiff's favor. (*Id.*)  To succeed on a claim of malicious prosecution, Plaintiff must prove the following: (1) the malicious institution of a prior proceeding against the plaintiff by the defendant; (2) the lack of probable cause for the filing of that prior suit; (3) the termination of that prior proceeding in the plaintiff's favor; (4) the seizure of the plaintiff's person or property during the course of the prior proceeding; and (5) injury or damages suffered by plaintiff as a result.  *Donohoe v. Burd*, 722 F. Supp. 1507, 1516–17

---

[18] Moreover, Plaintiff does not direct the Court to any evidence in support of this claim.  (Doc. 15 at 13).

(S.D. Ohio 1989) (citing *Crawford v. Euclid National Bank,* 19 Ohio St.3d 135, 483 N.E.2d 1168 (1985)).

Middletown argues that it is entitled to immunity with respect to this claim. A municipal corporation such as Middletown is a political subdivision for immunity purposes. *See* Ohio Rev. Code § 2744.01(F). The Supreme Court of Ohio recently set forth the relevant standard for determining whether a political subdivision is immune from tort liability:

> A claim of sovereign immunity by a political subdivision requires the three-tiered analysis provided in R.C. Chapter 2744. *Rankin v. Cuyahoga Cty. Dept. of Children & Family Servs.*, 118 Ohio St.3d 392, 2008-Ohio-2567, 889 N.E.2d 521, ¶ 16. Under the first tier of the analysis, a political subdivision has immunity for negligent acts as long as the negligent acts are in connection with governmental or proprietary functions. *See* R.C. 2744.02(A)(1); *Rankin* at ¶ 17. The second tier of the analysis examines whether any of the five exceptions listed in R.C. 2744.02(B) applies. *Rankin* at ¶ 18. If an exception does apply, the third tier of the analysis considers whether sovereign immunity can be reinstated by one of the statutorily listed defenses, such as the discretionary defenses set forth in R.C. 2744.03(A)(3) and (5). *Rankin* at ¶ 27.

*Baker v. Wayne Cty.*, 2016-Ohio-1566, ¶ 11.

Government functions include "[t]he provision or nonprovision of police, fire, emergency medical, ambulance, and rescue services or protection" and "[j]udicial, quasi-judicial, prosecutorial, legislative, and quasi-legislative functions." Ohio Rev. Code § 2744.01(C)(2)(a), (f). Because Plaintiff's malicious prosecution claim implicates the provision of police services and the execution of prosecutorial and judicial functions, the Court finds that Middletown was engaged in governmental functions when the alleged tort occurred. *See Harris v. Sutton*, 183 Ohio App. 3d 616, 2009–Ohio–4033, 918 N.E.2d

24

181, ¶ 13 (8th Dist.) ("the operation of a police department and the enforcement of the law are governmental functions.").

None of the exceptions to immunity are applicable. *See Griffits v. Vill. Of Newburgh Heights*, 8th Dist. Cuyahoga No. 91428, 2009-Ohio-493, ¶ 26 ("R.C. 2744.02(B) includes no specific exceptions for intentional torts"). [19] Accordingly, the Court need not reach the third tier of the *Rankin* analysis. For all of these reasons, Middletown is immune from liability on Plaintiff's malicious prosecution claim.

Plaintiff cites *Mayes v. Columbus*, 105 Ohio App.3d 728, 741, 664 N.E. 2d 1340 (10th Dist. 1995), for the proposition that statutory immunity is not available when acts or omissions are undertaken with a malicious purpose. (Doc. 15 at 14). In *Mayes*, the plaintiff sued the City of Columbus, Officer Molly Smith, and Detective Lorena Schrader for false arrest, malicious prosecution, and violation of Section 1983. After Mayes presented his case to the trial court, the trial court granted defendants' motion for a directed verdict on, *inter alia*, the malicious prosecution claim. *Mayes*, 105 Ohio App.3d at 735. Mayes then appealed to the Ohio Tenth District Court of Appeals. *Id.* The appellate court reversed and remanded, finding that there was sufficient factual evidence that the officers had acted with malicious purpose, in bad faith, or in a wanton

---

[19] The exceptions set forth in Ohio Rev. Code § 2744.02(B) occur when: (1) the injuries are caused by the negligent operation of a motor vehicle; (2) the injuries are caused by the negligent performance of a proprietary function; (3) the injuries are caused by the failure to keep public roads, highways and streets open, in repair and free from nuisance; (4) the injuries are caused by negligence on the grounds of a building used for governmental purposes; or (5) the injuries are those for which liability is expressly imposed by the Ohio Rev. Code. Plaintiff has not alleged that any of these exceptions apply in this case.

or reckless manner such that a directed verdict should not have been entered. *Id.* at 741. In reaching its decision, the appellate court relied on the provisions of Ohio Rev. Code § 2744.03(A)(6), which set forth three exceptions to the immunity provided to *employees* of political subdivisions under Ohio Rev. Code Chapter 2744. *Id.*

Here, Plaintiff cannot use Ohio Rev. Code § 2744.03(A)(6) to overcome Middletown's immunity defense because that provision only provides exceptions to immunity for claims against *employees* of political subdivisions. *See* Ohio Rev. Code § 2744.03(A)(6) ("the *employee* is immune from liability unless one of the following applies") (emphasis added). Plaintiff has not brought any claims against Middletown employees; instead he brings claims against Middletown itself. The Court's conclusion that Middletown is entitled to an immunity defense is supported by similar findings from Ohio courts. *See Harris v. Sutton*, 183 Ohio App.3d 616, 2009-Ohio-4033, 918 N.E.2d 181, ¶¶ 9–17 (finding the City of East Cleveland immune from liability for the intentional tort of malicious prosecution); *Price v. Austintown Local School District Bd. of Ed.*, 178 Ohio App.3d 256, 2008-Ohio-4514, 897 N.E.2d 700, ¶ 22 ("Since there is no exception to governmental immunity for intentional torts in R.C. 2744.02(B), it is apparent from the pleadings that the board is immune from prosecution for malicious prosecution."); *Griffits*, 2009-Ohio-493 at ¶ 26 (discussing cases holding political subdivisions immune from claims of, *inter alia*, malicious prosecution). For all of these reasons, Middletown is entitled to judgment as a matter of law on this claim.

**2.  Abuse of Process**

Lastly, Plaintiff alleges that his prosecution by Middletown "was an abuse of process, in that the real purpose of his prosecution was to find a way to terminate him from the HUD program."  (Doc. 4 at 12).  To succeed on a claim of malicious prosecution, Plaintiff must prove the following: (1) the defendant used legal process for an ulterior purpose; (2) the defendant intentionally or willfully committed some further act in the use of the process which was not proper in the regular conduct of the initiated proceeding; and (3) the plaintiff was directly injured or damaged by the wrongful use of process for the ulterior purpose.  *Donohoe*, 722 F.Supp. at 1517.

Middletown also argues that it is entitled to immunity with respect to this claim.  For the reasons set forth in Section IV.B.1, *supra*, this argument is well-taken.  *See also Walsh*, 8th Dist. Cuyahoga No. 92309, 2009-Ohio-2377, ¶ 11 ("Since the Village is a political subdivision under R.C. 2744.01(F), it is immune from Walsh's claims of malicious prosecution . . . and abuse of process because they are intentional torts.").

## V.   CONCLUSION

Accordingly, for the foregoing reasons:

1.  Defendant's motion for summary judgment (Doc. 14) is **GRANTED**;

2.  The Clerk shall enter judgment accordingly, whereupon this civil action is **CLOSED** in this Court.

**IT IS SO ORDERED**.


Date:  7/15/16                                          *s/ Timothy S. Black*
                                                        Timothy S. Black
                                                        United States District Judge

27